IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

---

CHRISTOPHER MOSES, et al.,

        Plaintiffs,                           Case No. 22-CV-665

    v.

COMCAST CABLE COMMUNICATIONS MANAGEMENT, LLC,

        Defendant.

---

BRIEF IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION

---

WISCONSIN INSTITUTE FOR LAW & LIBERTY

Rick Esenberg
*rick@will-law.org*

Daniel P. Lennington
*dan@will-law.org*

Katherine D. Spitz
*kate@will-law.org*

330 E. Kilbourn, Suite 725
Milwaukee, WI 53202-3141
Phone: 414-727-9455
Fax: 414-727-6385

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

FACTS ....................................................................................................................... 2

   I.   The Comcast RISE Program .......................................................................... 2

   II.  The Plaintiffs ................................................................................................. 5

ARGUMENT ............................................................................................................. 7

   I.   Standard of Review ....................................................................................... 7

   II.  Plaintiffs Are Likely to Succeed on Their Claim That Comcast RISE
       Violates Section 1981 .................................................................................. 8

          A.   On its face, Comcast's race-based eligibility requirement
              violates Section 1981 ...................................................................... 8

          B.   Comcast's stated reasons for the race-based eligibility
              requirement are no defense to liability under Section 1981 .......... 11

   III. Plaintiffs Will Be Irreparably Harmed if an Injunction is not Granted ........... 16

   IV. The Public Interest and Balance of Harms Weigh Heavily in Favor of an
       Injunction .................................................................................................... 18

CONCLUSION ....................................................................................................... 20

**INTRODUCTION**

Comcast operates a grant program to help small businesses. The program, called Comcast RISE, offers marketing, technology, consulting, and advertising resources to small businesses. If selected to participate in Comcast RISE, Comcast agrees to provide a certain menu of benefits to small business owners, and in exchange, the recipient signs over certain rights related to publicity and promotion. In short, Comcast RISE grants (or as Comcast sometimes calls them, "awards") are legal contracts.

Plaintiffs would like to contract with Comcast and receive a Comcast RISE grant. They meet *almost* all the qualifications. But there is one qualification they cannot meet: they are the wrong race. Because Plaintiffs are white, Comcast deems them *categorically ineligible* for the program. In Comcast's own words, Comcast RISE is "only open to businesses owned by people of color."[1]

This is illegal race discrimination. In the Civil Rights Act of 1866 (also known as Section 1981), Congress prohibited race discrimination in contracting. The Comcast RISE program violates this prohibition because it bases eligibility on race, causing Plaintiffs, who are white small business owners, to be ineligible.

Because Comcast is currently engaged in this intentional race discrimination, and its current grant period is ongoing and set to close on June 17, 2022, Plaintiffs seek an injunction to prohibit its use of race as a factor in the Comcast RISE grants pending final disposition of this lawsuit.

---

[1] Comcast has recently expanded this program to include female-owned businesses, but that gender-based eligibility requirement is not the subject of this lawsuit.

## FACTS

### I.    The Comcast RISE Program

Comcast sponsors a grant program called "Comcast RISE Small Business Program." Doc. 1, ¶14.[2] RISE is an acronym for "Representation, Investment, Strength and Empowerment." Doc. 1, ¶14. The details of Comcast RISE are available at ComcastRISE.com. Doc. 1, ¶15.

According to Comcast's website, "small businesses have been dealing with the ongoing impact of the pandemic, social unrest, and environmental events." Doc. 1, ¶15. Comcast says that "[s]mall businesses owned by people of color or women have been some of the hardest hit." Doc. 1, ¶15. Because of these racial and gender disparities, Comcast explains that "Comcast RISE was created to invest in the success of these critical businesses." Doc. 1, ¶15.

Comcast's website further describes Comcast RISE as "a multi-year commitment to provide marketing, creative, media, and technology services to small businesses owned by people of color or women." Doc. 1, ¶16.

Comcast's website lays out the eligibility requirements, which contain an explicit racial qualification. According to Comcast,

You are eligible to apply for this program if your business:

- Is at least 51% owned and operated by someone who identifies as Black, Indigenous, a Person of Color, or a Female

- Is independently owned and operated; not a franchise location

- Is registered to conduct business in the US

---

[2] Citations to the Verified Complaint will be "Doc. 1, ¶__."

- Has been operating for one or more years

- Is located within the Comcast Business or Effectv service area footprint. Doc. 1, ¶17.

Lest there be any doubt as to Comcast's requirements, a FAQ on the website asks: "Is this program only open to businesses owned by people of color?" Doc. 1, ¶18. Comcast's answer is unequivocal: "Yes; the current program eligibility is focused on businesses owned by people of color, including Black, indigenous, Hispanic, and Asian American owners, among others." Doc. 1, ¶18.

Anticipating the next question, the FAQ continues: "Why are only businesses owned by people of color eligible?" Doc. 1, ¶19. The answer: Comcast has been "leaning in" to support "businesses owned by people of color" "because these marginalized communities are hit hardest by the effects of the pandemic." Doc. 1, ¶19.

Elsewhere, Comcast again reaffirms that only "small and medium-sized pictures owned by people of color" are "eligible to apply for marketing and technology services." Other requirements include:

a. The owner is at least 18 years old, the primary decisionmaker, and actively engaged in the day-to-day operation of the business;

b. No more than 25 full-time and part-time employees for the Tech Makeover;

c. No more than 100 full-time and part-time employees for the Consultation, Media and Creative;

d. For the Tech Makeover, cannot be a home-based business, a business operating at a residential address, or a business that does not have a permanent, fixed location;

e. Established business operations for at least one calendar year;

- 3 -

f.   Registered to conduct business in the United States (with minor exceptions that do not apply here);

g.   Independently owned and operated; and

h.   Employees and independent contractors of Comcast Corporation and its affiliates are not eligible.

Doc. 1, ¶20.

Eligible applicants are invited to complete a thorough application at ComcastRISE.com/rise-apply. Doc. 1, ¶21. Applicants provide personal information, details about their business, answers to several questions, and "a link to a video of you telling us more about your business." Doc. 1, ¶21.

In exchange for Comcast agreeing to review a completed application, applicants "grant Sponsor the non-exclusive, royalty-free, and irrevocable rights to use, reproduce, copy, publish, display, distribute, perform, translate, adapt, modify, and otherwise exploit the Submission and to incorporate the Submission in other works in any and all markets and media worldwide in perpetuity." Doc. 1, ¶22. In addition, "[a]ll Submissions and Videos become property of [Comcast] and will not be acknowledged or returned." Doc. 1, ¶22.

Upon receiving a completed application, Comcast evaluates eligible applications based on three criteria: "completeness of submission," "originality of submission," and "persuasiveness of responses to questions provided on why the applicant should be considered for the Comcast RISE program." Doc. 1, ¶23.

Comcast RISE grant recipients will receive one or more of the following business services:

A. Consultation: general business and marketing consulting providing insights on how to grow their business.

B. Media: a linear TV media schedule, over a 90-day period from Effectv.

C. Creative Production: turnkey :30 TV commercial production for their business.

D. Technology Makeover: This will include some combination of Comcast Business Internet, Voice, cybersecurity malware protection and video surveillance services with no monthly service charge for up to a 12-month period and computer equipment form a selection of desktops, laptops or tablets. Tech Makeover services can only be awarded to one business location for a 12-month consecutive period.

E. Additional Benefits: marketing and data insights via the Comcast RISE monthly newsletter, as well as a virtual listing, including contact information on the Comcast RISE website to all eligible applicants.

Doc. 1, ¶24. In exchange for these benefits, RISE grantees "will be required to execute and return an affidavit of eligibility, release of liability, [and] publicity release." Doc. 1, ¶25.

Since 2020, Comcast awarded over 8,000 small businesses RISE grants, boasting grant recipients in 590 cities in 34 states. Doc. 1, ¶26. The current grant period continues until June 17, 2022. Doc. 1, ¶27.

## II.    The Plaintiffs

Plaintiffs are four small businesses and owners, all of whom are white males.

Christopher Moses is a white male who owns All American Clean LLC, which is a commercial cleaning company based in Greenwood, Indiana. Doc. 1, ¶6. Mr. Moses is a disabled combat veteran who joined the Indiana Army National Guard right after 9/11. He served in Iraq traveling on daily convoys throughout the country to train Iraqi police officers. He also served in Bosnia and assisted local law

enforcement in Mississippi following Hurricane Katina. Mr. Mosses retired at the rank of Staff Sergeant. He started All American Clean in 2012 and runs the business with his wife. Doc. 1, ¶6.

Themi Sacarellos owns Round the Clock East Inc., a restaurant in York, Pennsylvania, along with his father Dimos Sacarellos. Doc. 1, ¶7. Dimos is a Greek immigrant who came to America in the 1967 with $10 to his name. Now Dimos owns and operates multiple successful restaurants, including Round the Clock East, with his son Themi. Both Themi and Dimos are white males. Doc. 1, ¶7.

Antonio Vitolo is a white male who owns a Jake's Bar and Grill, LLC, in Harriman, Tennessee. Doc. 1, ¶8. Mr. Vitolo was previously the victim of race discrimination by the Small Business Administration as detailed in *Vitolo v. Guzman*, 999 F.3d 353 (6th Cir. 2021).

Alfred Castiglioni is a white male who owns Chardonnay's Restaurant in Seekonk, Massachusetts. Doc. 1, ¶9. He was also a plaintiff in *Vitolo, supra.*

Each Plaintiff individually meets the race-neutral qualifications for a Comcast RISE grant. Doc. 1, ¶10, 28.  Each individual Plaintiff is over 18 years old, owns his own small business, is the primary decision maker for that business, and has been actively engaged in the day-to-day operation of his businesses for over a year. Doc. 1, ¶10. Each business is registered to conduct business in one of the 48 contiguous United States, independently owned and operated, not a franchise, and has 100 or fewer employees. Doc. 1, ¶10.  No plaintiff is an employee of Comcast Corporation, its parents, affiliates, or subsidiaries. Doc. 1, ¶10. Each Plaintiff business is located

within the Comcast Business or Effectv service area footprint. Apart from being white, each individual plaintiff is eligible for the Comcast Rise Small Business Program and their businesses do not fall into any of the prohibited categories at ComcastRISE.com/legal. Doc. 1, ¶10.

Because they were ineligible to apply because of their race, Plaintiffs did not apply. Doc. 1, ¶29. Had it not been for the racial criteria, Plaintiffs would have applied. Doc. 1, ¶30. Plaintiffs' businesses would benefit from a Comcast RISE grant and Plaintiffs would apply if the racial criteria were eliminated. Doc. 1, ¶31. Defendant's explicit race-based criteria prevent Plaintiffs from competing for a Comcast RISE grant on an equal footing with non-white applicants. Doc. 1, ¶32.

## ARGUMENT

### I.   Standard of Review

A party seeking a preliminary injunction must demonstrate "(1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If a plaintiff meets these factors, the court proceeds to "a balancing phase, where it must then consider: (3) the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Cassell v. Snyde*rs, 990 F.3d 539, 545 (7th Cir. 2021) (citation omitted).

## II.   Plaintiffs Are Likely to Succeed on Their Claim That Comcast RISE Violates Section 1981

### A.   On its face, Comcast's race-based eligibility requirement violates Section 1981

Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976). The statute reads: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts … and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). While the statute includes the phrase "the same right … as is enjoyed by white citizens," the Supreme Court has held that the statute also applies to private racial discrimination "against white persons." *L.N. McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273 (1976).

The statute defines the phrase "make and enforce contracts" as including the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "Any claim brought under § 1981 … must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). "Such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts." *Id.*

In *Runyon*, the Supreme Court found liability under § 1981 "when, for racially motivated reasons, [the defendants] prevented individuals who *sought to enter* into

contractual relationships from doing so." *Id.* (emphasis in original, citations omitted). In the unanimous opinion in *Domino's Pizza*, the Court wrote that "[w]e have never retreated from what should be obvious from the reading of the statute: Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship." *Id.* Put another way, Section 1981 is violated by a "refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Patterson v. McLean Credit Union*, 491 U.S. 164, 177 (1989).

Here, Comcast offers the opportunity for a contractual relationship with qualifying small businesses in two separate ways. First, to have an application considered, applicants must grant Comcast "the non-exclusive, royalty-free, and irrevocable rights to use, reproduce, copy, publish, display, distribute, perform, translate, adapt, modify, and otherwise exploit the Submission and to incorporate the Submission in other works in any and all markets and media worldwide in perpetuity." Doc. 1, ¶22. Second, if selected for an award, applicants "will be required to execute and return an affidavit of eligibility, release of liability, [and] publicity release." Doc. 1, ¶25.

In exchange for this valuable consideration from chosen applicants, Comcast awards winners valuable services: "general business and marketing consulting," "a linear TV media schedule, over a 90-day period," a "turnkey :30 TV commercial production," a generous "technology makeover," and other "additional benefits." Doc. 1, ¶24. In any jurisdiction, a Comcast RISE applicant's promise to give property and

publicity rights in exchange for valuable business services would constitute a contract. *See* Restatement (Second) of Contracts § 1 (1981).

But Plaintiffs cannot even *compete* for the chance to contract with Comcast. They are white business owners. Comcast excludes white people from consideration, declaring them ineligible on the front end. Plaintiffs would like a Comcast RISE grant, and in fact, would apply for a Comcast RISE grant, but they have no opportunity to compete for the program because they are white. Doc. 1, ¶¶28–32.

The fact that Plaintiffs have not applied is of no matter. As explained by the U.S. Supreme Court, Plaintiffs demonstrate injury by identifying a "discriminatory policy that prevents [the plaintiff from competing] on an equal basis," and establishing that the applicant is "able and ready" to apply. *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 666 (1993). The injury to Plaintiffs, in this case, is the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.* In *Gratz v. Bollinger*, which struck down a race-based college admissions policy as a violation of Section 1981 (among other things), the Supreme Court held that the student only needed to show he was "able and ready" to apply. 539 U.S. 244, 262 (2003). In the same way, Plaintiffs in this case are "able and ready" to apply for a Comcast RISE grant. Doc. 1, ¶¶29–31.

Moreover, as the Supreme Court recognized over 45 years ago, "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and

certain rejection." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977). "If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Id.* Comcast RISE's policy of "nonwhites only" has the same chilling effect upon all potential applicants as a policy of "whites only" on the hiring-office door.

### B.   Comcast's stated reasons for the race-based eligibility requirement are no defense to liability under Section 1981

Racial classifications under Section 1981 are subject to strict scrutiny. *Gratz*, 539 U.S. at 276 n.23 (holding that defendants violated Section 1981 for the same reasons it violated the Fourteenth Amendment); *Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (similarly applying strict scrutiny to Section 1981); *General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 389–391 (1982) (the prohibition against discrimination in § 1981 is co-extensive with the Equal Protection Clause). Under that standard, Comcast would have to justify its race-based criteria with a compelling interest that is narrowly tailored. This is a high bar Comcast cannot meet.

To establish a compelling interest in race-based qualifications, "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was *necessary, 'before* it embarks on an affirmative-action program.'" *Wis. Legislature v. Wis. Elections Comm'n,* 595 U.S. __ (2022) (Slip. Op. at 5) (quoting *Shaw v. Hunt*, 517 U.S. 899, 909–10 (1996)). Using this type and quality of evidence, a defendant has a "compelling interest in remedying past

discrimination only when three criteria are met." *See Vitolo v. Guzman*, 999 F.3d 353, 361 (6th Cir. 2021); *accord Faust v. Vilsack*, 519 F. Supp. 3d 470, 475 (E.D. Wis. 2021).

First, the program must target a specific episode of past discrimination rather than generalized discrimination throughout society or within an industry. *Shaw*, 517 U.S. at 909; *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 498 (1989); *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 226 (1995). An allegation of generalized societal discrimination is "not adequate because it provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Shaw*, 517 U.S. at 909. In short, "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id*. Over several decades, the Supreme Court has repeatedly reaffirmed this basic principle that remedying past societal discrimination does not justify race-conscious programs. *See, e.g., Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 731 (2007); *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 310 (1978).

Second, there must be strong evidence of *intentional* discrimination in the past. *Croson*, 488 U.S. at 503. "Statistical disparities don't cut it." *Vitolo*, 999 F.3d at 361; *see Builders Ass'n of Greater Chicago v. Cty. of Cook*, 256 F.3d 642, 644–45 (7th Cir. 2001). "Raw statistical disparities prove little; they certainly do not prove intentional discrimination. ... [N]ot all of these disparities are plausibly attributable to intentional, or for that matter unintentional, discrimination." *McNamara v. City of Chicago*, 138 F.3d 1219, 1222–23 (7th Cir. 1998). Relying on statistical disparities only aims the defendant toward "racial balancing," and this can never be a

"compelling end in itself [because it] would effectively assure that race will always be relevant in American life, and that the ultimate goal of eliminating entirely from governmental decisionmaking such irrelevant factors as a human being's race will never be achieved." *Parents Involved*, 551 U.S. at 730.

Third, if the defendant "show[s] that it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of [a] local ... industry," then the defendant can act to undo the discrimination. *Croson*, 488 U.S. at 492 (plurality opinion). The defendant must prove that it "knowingly perpetuated the discrimination," and therefore became "a kind of joint tortfeasor, coconspirator, or aider and abettor." *Builders Ass'n of Greater Chicago*, 256 F.3d at 645. Importantly, such evidence must be "recent." *See, e.g., id.*

In this case, Comcast's justification fails on all counts. Comcast points only to generalized "societal discrimination," *Shaw*, 517 U.S. at 910, and "statistical disparities," *Vitolo*, 999 F.3d at 361, which "don't cut it," *id.* Comcast justifies its race-based eligibility requirements because "[s]mall businesses owned by people of color or women have been some of the hardest hit" by "the pandemic, social unrest, and environmental events." Doc. 1, ¶15.  Specifically, Comcast explains that "between February and April 2020, the number of active Black-owned businesses declined by 41%, Latinx-owned businesses declined by 32%, and Asian-owned businesses dropped by 25%, versus just 21% for the general population." Doc. 1, ¶15. Elsewhere in a FAQ, Comcast explains its reasoning for the race-based qualifications: "Comcast has been "leaning in" to support "businesses owned by people of color" "because these

marginalized communities are hit hardest by the effects of the pandemic." Doc. 1, ¶ 19.

Comcast's justifications for Comcast RISE are based solely on statistical disparities. Comcast does not point to intentional, recent, episodes of discrimination that it hopes to cure. And Comcast is presumably not trying to remedy its *own* racial discrimination. Comcast simply claims that minority businesses have been the "hardest hit" by the pandemic, social unrest, and environmental impacts. But this is no excuse for the explicit and intentional race discrimination in the Comcast RISE program and cannot meet strict scrutiny.

Yet even if Comcast could establish a compelling interest, its chosen remedy—a race-based eligibility requirement—is not narrowly tailored. Narrow tailoring requires "a close match between the evil against which the remedy is directed and the terms of the remedy." *Builders Ass'n of Greater Chicago*, 256 F.3d at 646. In other words, a program must discriminate no more than is necessary to address the harm it is intended to remedy. *Shaw*, 517 U.S. at 909–10; *Adarand*, 515 U.S. at 224, 235, 237–38; *Builders Ass'n of Greater Chicago*, 256 F.3d at 644. Specifically, for a policy to survive narrow-tailoring analysis, the defendant must show "serious, good faith consideration of workable race-neutral alternatives." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003); *Croson*, 488 U.S. at 507. This requires the defendant "to engage in a genuine effort to determine whether alternative policies could address the alleged harm." *Vitolo*, 999 F.3d 362. Therefore, a court must not uphold a race-conscious

policy unless it is "satisfied that no workable race-neutral alternative" would achieve the compelling interest. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 312 (2013).

Comcast has not narrowly tailored Comcast RISE. Comcast's stated goal is to help small businesses hit hardest by "the pandemic, social unrest, and environmental events." Doc. 1, ¶15. And Comcast is certainly free to target those small businesses in a race-neutral fashion. For example, Comcast could have solicited, in a race-neutral manner, applications from those businesses suffering from recent events. Then, Comcast could have judged each applicant as an individual against those race-neutral criteria, rather excluding certain businesses based on race. And if Comcast wanted to reach out to minority-owned businesses and encourage those businesses to apply, it could have targeted advertising or other outreach to that community. But Comcast did none of that; it simply wrote up qualifications based on race. This ham-fisted remedy is not narrowly tailored.

As such, because of the explicit and intentional race discrimination employed by Comcast, and Comcast's inability to meet strict scrutiny, Plaintiffs are likely to succeed on the merits of their claim.[3]

---

[3] While Seventh Circuit cases employ the familiar *McDonnell-Douglas* in the typical Section 1981, this case is far from typical. *See, e.g., Oliver v. Joint Logistics Managers, Inc.,* 893 F.3d 408, 411 (7th Cir. 2018). First, the typical Section 1981 case arises in the employment setting; this case does not. Second, *McDonnell-Douglas* is employed when the *defendant* moves for summary judgment and addresses the evidence *plaintiff* must proffer to get to trial. Here, Plaintiffs seek a preliminary injunction and will eventually move for summary judgment, since no facts will be disputed. Even if this Court fashioned a test based on *McDonnell-Douglas*, however, Plaintiffs would still prevail for all the reasons stated above. Plaintiffs have offered direct evidence of intentional discrimination in the form of the eligibility requirements, and Comcast does not dispute those requirements. *Cf. Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008) (discussing "direct evidence").

### III.     Plaintiffs Will Be Irreparably Harmed if an Injunction is not Granted

Before a preliminary injunction may be granted, Plaintiffs must show that they "will suffer 'irreparable harm' if the preliminary junction is not granted," *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984), and that they have no adequate remedy at law, *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992). "[A]n adequate remedy at law…is[ ] whether interim harm caused by the activity to be enjoined can be completely offset by a subsequent award of damages or other legal relief." *Maxim's Ltd. v. Badonsky*, 772 F.2d 388, 390 (7th Cir.1985).

Here, Comcast's program certainly leads to irreparable harm that cannot be satisfied by a monetary judgment at some later date. The alleged harm is simple and straightforward: ongoing race discrimination. Comcast RISE's current application period ends June 17, 2022. That means from now until that date, Plaintiffs are deemed unwelcome and ineligible applicants based on race. And after that date, Comcast will award applicants based on race, and then presumably start a new application period with the same racial criteria absent injunctive relief, as they have done in prior award periods.

This is an irreparable harm because no amount of damages can cure Comcast's ongoing race-based discrimination. The damages here are not monetary in nature—race discrimination is harm to human dignity. It is of no matter that Comcast's program is "Nonwhites Only," as compared to a program that is "Whites Only." *See Int'l Bhd. of Teamsters*, 431 U.S. at 365. The harm is identical and should be enjoined in either case.

The Supreme Court has described the nature of the harm caused by racial discrimination in terms of an irreparable injury to basic human dignity. "[A] racial classification causes 'fundamental injury' to the 'individual rights of a person.'" *Shaw*, 517 U.S. at 908 (citation omitted). Indeed, the *primary* injury in a case such as this is "the denial of equal treatment" itself. *City of Jacksonville, Fla.*, 508 U.S. at 666. Plaintiffs, and thousands of other small business owners, are being treated differently by Comcast based solely on the color of their skin. Such unequal treatment "demeans us all." *Grutter v. Bollinger*, 539 U.S. 306, 353 (2003) (Thomas, J., concurring in part and dissenting in part).

Following these basic considerations, multiple federal courts have held that irreparable injury is presumed when the government discriminates on the basis of race. *E.g.*, *Vitolo*, 999 F.3d at 364; *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 428–29 (D.C. Cir. 1991); *San Francisco NAACP v. San Francisco Unified Sch. Dist.*, 59 F. Supp. 2d 1021, 1034 (N.D. Cal. 1999) ("[P]laintiffs were suffering irreparable injury by being subjected to unconstitutional racial classifications."); *see also DynaLantic Corp. v. U.S. Dep't of Def.*, 885 F. Supp. 2d 237, 292 (D.D.C. 2012) ("Because DynaLantic succeeds on the merits of its as-applied constitutional equal protection claim, the Court finds this deprivation of Plaintiff's constitutional rights constitutes irreparable harm.").

Admittedly, Comcast is not a government agency, but courts have found the same principles of irreparable harm apply to *private* race discrimination. According to the Eleventh Circuit, "we hold that because of the subtle, pervasive, and essentially

irremediable nature of racial discrimination, proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury." *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984). "Victims of discrimination suffer irreparable injury, regardless of pecuniary damage." *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982). Other courts have held that ongoing racial discrimination is "per se irreparable harm." *Small v. Hudson*, 322 F. Supp. 519, 529 (M.D. Fla. 1970). And courts have issued injunctions where a private company discriminates against customers based on race. *Robinson v. Power Pizza, Inc.,* 993 F. Supp. 1462, 1466 (M.D. Fla. 1998). Finally, private race discrimination cases in the 1960s resulted in the issuances of injunctions. *See, e.g., Lewis v. Greyhound Corp.*, 199 F. Supp. 210 (M.D. Ala. 1961) (injunction against private motor carriers).

So too here. Comcast's explicit race discrimination is ongoing and illegal, as described above. In addition to the current grant period, Comcast will continue to maintain the same practices absent an injunction. An injunction is therefore necessary to protect Plaintiffs' rights during the pendency of this lawsuit. In the same way a "whites only" business-support program would cause irreparable harm to *non-whites* (and society as a whole), Comcast's "whites need not apply" program creates the same harm for Plaintiffs. *See Int'l Bhd. of Teamsters*, 431 U.S. at 365.

## IV.  The Public Interest and Balance of Harms Weigh Heavily in Favor of an Injunction

"Racial discrimination inherently is an issue of the most serious public concern." *Purnell v. Smart*, 976 F.2d 735 (7th Cir. 1992) (citation omitted). This is

particularly true where, as here, Comcast is imposing a *nationwide* racial qualification. Comcast RISE's eligibility requirements exclude Plaintiffs because they are white and male. There is no public interest that would permit the continued imposition of this race-based qualification.  *Cf. Doe v. Kelly*, 878 F.3d 710, 718 (9th Cir. 2017); *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) ("[N]o substantial harm can be shown in the enjoinment of an unconstitutional policy.").

On the other hand, Comcast will suffer no harm from an injunction. They may continue their program, but instead of targeting applicants based on race, they can target small business owners who have, as they say, "been dealing with the ongoing impact of the pandemic, social unrest, and environmental events." Doc. 1, ¶15. They can, if they would like, even target those businesses who have been "the hardest hit." Doc. 1, ¶15. And with respect to minority business owners who are currently eligible for Comcast RISE, an injunction will not prevent Comcast from continuing to offer relief to them (or any other business). An injunction would simply prohibit offering such assistance based solely on illegal racial categories.

Plaintiffs do not seek any special treatment, only equal treatment under the law. If an injunction is granted, all business owners will have to be treated equally, regardless of race, as federal law requires.

## CONCLUSION

Plaintiffs request that the Court issue a preliminary injunction enjoining Comcast from operating the Comcast RISE award program with race-based qualifications.


Dated: April 4, 2022                    WISCONSIN INSTITUTE FOR LAW & LIBERTY

                                        Attorneys for Plaintiffs

                                        Rick Esenberg (pro hac vice pending)
                                        rick@will-law.org

                                        Daniel P. Lennington (pro hac vice pending)
                                        dan@will-law.org

                                        /s/ Katherine D. Spitz
                                        Katherine D. Spitz
                                        kate@will-law.org
                                        330 E. Kilbourn, Suite 725
                                        Milwaukee, WI 53202-3141
                                        PHONE: 414-727-9455
                                        FAX: 414-727-6385