IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| CHRISTOPHER MOSES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:22-CV-00665 |
| | ) | |
| | ) | |
| v. | ) | Hon. James Patrick Hanlon |
| | ) | Hon. Mark J. Dinsmore |
| COMCAST CABLE COMMUNICATIONS | ) | |
| MANAGEMENT, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION

Paul D. Clement (pro hac vice)
Kasdin M. Mitchell (pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
paul.clement@kirkland.com

*Counsel for Defendant*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ....................................................................................................... 2

     A.    Legal and Factual Background ......................................................... 2

     B. Procedural History ......................................................................... 12

SUMMARY OF ARGUMENT ................................................................................. 13

ARGUMENT .......................................................................................................... 15

I.     Plaintiffs Are Unlikely To Succeed On The Merits Of Their §1981 Claim. ..................... 15

     A.    Comcast's RISE Program Does Not Implicate §1981 ......................... 15

     B. Plaintiffs' Claim Fails Even If It Implicates §1981 ...................................... 20

II.     Plaintiffs Fail To Establish Irreparable Injury. ................................................. 24

III.     The Balance of Equities and Public Interest Strongly Favor Comcast. ........................... 28

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Chicago*,
    135 F.3d 1150 (7th Cir. 1998) ...................................................................25, 26, 27

*Barton v. Hewlett-Packard Co.*,
    635 F. App'x 46 (3d Cir. 2015) ...........................................................................17

*Bedrossian v. Nw. Mem'l Hosp.*,
    409 F.3d 840 (7th Cir. 2005) ...........................................................................25, 26

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ........................................................................................30

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief & Dev.*,
    291 F.3d 1000 (7th Cir. 2002) .............................................................................22

*CBOCS W., Inc. v. Humphries*,
    553 U.S. 442 (2008) .........................................................................................3, 15

*Christensen v. Equitable Life Assur. Soc. of U.S.*,
    767 F.2d 340 (7th Cir. 1985) .......................................................................4, 21, 23

*City of Memphis v. Greene*,
    451 U.S. 100 (1981).........................................................................................2, 3

*Daveri Dev. Grp., LLC v. Vill. of Wheeling*,
    935 F. Supp.2d 987 (N.D. Ill. 2013) ...................................................................27

*Doe v. Kamehameha Schs.*,
    470 F.3d 827 (9th Cir. 2006) ...................................................................... *passim*

*Domino's Pizza Inc. v. McDonald*,
    546 U.S. 470 (2006).......................................................................3, 15, 17, 18

*Druco Restaurants, Inc. v. Steak N Shake Enters., Inc.*,
    765 F.3d 776 (7th Cir. 2014) ...............................................................................17

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006).............................................................................................26

*Edmonson v. U.S. Steel Corp.*,
    659 F.2d 582 (Former 5th Cir. Unit B 1981) ......................................................21

*Ekanem v. Health & Hosp. Corp. of Marion Cnty.*,
   589 F.2d 316 (7th Cir. 1978) ...........................................................25, 26

*Ferrill v. Parker Grp., Inc.*,
   168 F.3d 468 (11th Cir. 1999) ................................................................21

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*,
   458 U.S. 375 (1982) .............................................................................2, 21

*Gensinger Clinic v. Di Cuccio*,
   606 A.2d 509 (Pa. Super. Ct. 1992) ......................................................17

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ................................................................................21

*Gresham v. Windrush*,
   730 F.2d 1417 (11th Cir. 1984) .............................................................26

*Grutter v. Bollinger*,
   539 U.S. 306 (2003) ................................................................................21

*Hetreed v. Allstate Ins. Co.*,
   135 F.3d 1155 (7th Cir. 1998) ...............................................................25

*Ill. Repub. Party v. Pritzker*,
   973 F.3d 760 (7th Cir. 2020) .................................................................24

*Ind. C.L. Union v. O'Bannon*,
   259 F.3d 766 (7th Cir. 2001) .................................................................30

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*,
   138 S. Ct. 2448 (2018) ...........................................................................22

*Johnson v. Transp. Agency*,
   480 U.S. 616 (1987) ................................................................................21

*Kyles v. J.K. Guardian Sec. Servs., Inc.*,
   222 F.3d 289 (7th Cir. 2000) .................................................................15

*Lehman v. Yellow Freight Sys., Inc.*,
   651 F.2d 520 (7th Cir. 1981) .................................................................21

*Lewis v. Greyhound Corp.*,
   199 F. Supp. 210 (M.D. Ala. 1961) .......................................................27

*Lugar v. Edmondson Oil Co., Inc.*,
   457 U.S. 922 (1982) ................................................................................26

iii

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ....................................................................................15

*McCutcheon v. FEC*,
   572 U.S. 185 (2014) ....................................................................................22

*McDonald v. Santa Fe Trail Transp. Co.*,
   427 U.S. 273 (1976) ................................................................................3, 15

*Melendez v. Ill. Bell Tel. Co.*,
   79 F.3d 661 (7th Cir. 1996) .......................................................................20

*Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*,
   128 F.3d 1111 (7th Cir. 1997) ....................................................................28

*Nat'l Fed'n of the Blind v. Abbott*,
   647 F.3d 202 (5th Cir. 2011) ......................................................................22

*Orr v. Shicker*,
   953 F.3d 490 (7th Cir. 2020) ....................................................14, 15, 27, 28

*Payton v. Walsh*,
   2022 WL 80317 (S.D. Ind. Jan. 7, 2022) ..................................15, 25, 27

*Penn v. Ryan's Fam. Steak Houses, Inc.*,
   269 F.3d 753 (7th Cir. 2001) ......................................................................17

*Pennsy Supply, Inc. v. Am. Ash Recycling Corp.*,
   895 A.2d 595 (Pa. Super. 2006) .................................................................18

*Planet Aid v. City of St. Johns*,
   782 F.3d 318 (6th Cir. 2015) ......................................................................22

*Ramirez v. Collier*,
   142 S. Ct. 1264 (2022) ................................................................................29

*Riley v. Nat'l Fed'n of the Blind*,
   487 U.S. 781 (1988) ....................................................................................22

*Robinson v. Power Pizza, Inc.*,
   993 F. Supp. 1462 (M.D. Fla. 1998) ..........................................................27

*Rothe Dev., Inc. v. Dep't of Def.*,
   107 F. Supp. 3d 183 (D.D.C. 2015) ..............................................................5

*Runyon v. McCrary*,
   427 U.S. 160 (1976).................................................................................3, 15

*Schurr v. Resorts Int'l Hotel, Inc.*,
    196 F.3d 486 (3d Cir. 1999) ........................................................21

*Setser v. Novack Inv. Co.*,
    657 F.2d 962 (8th Cir. 1981) ...................................................4, 21

*United States v. Hayes Int'l Corp.*,
    415 F.2d 1038 (5th Cir. 1969) ...................................................27

*United States v. Oakland Cannabis Buyers' Co-op.*,
    532 U.S. 483 (2001) ...................................................................29

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) ...................................................................18

*United Steelworkers v. Weber*,
    443 U.S. 193 (1979) ...................................................................16

*Vietnamese Fisherman's Ass'n v. Knights of the Ku Klux Klan*,
    543 F. Supp. 198 (S.D. Tex. 1982) ...........................................27

*Walker v. Abbott Lab'ys*,
    340 F.3d 471 (7th Cir. 2003) .....................................................17

*Weavertown Transp. Leasing, Inc. v. Moral*,
    834 A.2d 1169 (Pa. Super. 2003) ..............................................19

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ...................................................27

*Winter v. Nat. Resources Def. Counsel, Inc.*,
    555 U.S. 7 (2008) .......................................................................15

**Statutes**

12 U.S.C. §5452 ...............................................................................6, 29

12 U.S.C. §5708 .......................................................................2, 3, 5, 29

15 U.S.C. §631 .................................................................................5, 29

15 U.S.C. §637 .........................................................................................5

15 U.S.C. §9007 ...............................................................................5, 29

42 U.S.C. §1981 ...........................................................................*passim*

13 Stat. 507 (Mar. 3, 1865) .....................................................................4

14 Stat. 173 (July 16, 1866) ...........................................................................................................4

## INTRODUCTION

Comcast adopted the targeted giving program at issue here—the RISE program—for the best of reasons. Comcast has always offered its basic suite of services on non-discriminatory terms. But in the face of alarming data that the COVID-19 pandemic and other contemporaneous events were having ruinous effects on minority-owned small businesses, Comcast, like numerous government and private actors, wanted to do something more for the hardest hit communities. The RISE program was a cornerstone of that effort, giving qualified minority-owned small business owners the opportunity to apply for grants that include certain services and benefits.

Plaintiffs—four white, male small-business owners—suggest that Comcast's efforts, and by extension the programs of countless other businesses and numerous longstanding scholarships and other forms of targeted generosity, are unlawful and should be stopped in their tracks. Under plaintiffs' theory, such efforts, no matter how well-intentioned or long-established, violate the Nation's first civil rights statute, 42 U.S.C. §1981. That theory is as novel as it is wrong. Section 1981 has been on statute books since 1866, and it has never been used as a sword against this kind of targeted generosity, as opposed to the discriminatory denial of the opportunity to contract for commercial services or employment. The reason is straightforward, as these offers of generosity, and the ancillary agreements that underlie them, are not ordinary contracts subject to §1981 and implicate the First Amendment rights of the benefactors. Moreover, unlike ordinary contracts for the services that are a necessary function of the company's business operations, such well-intentioned efforts at targeted generosity are hardly compulsory. If they generate §1981 liability, the predictable result will be less generosity, not more opportunity or equal access.

What plaintiffs ultimately seek here is a fundamental reshaping of both law and practice. They seek to subject efforts at targeted generosity to §1981 despite decades of contrary practice, and they seek to subject programs like Comcast's to strict scrutiny, despite circuit law to the

contrary.  For plaintiffs to prevail, they will need to transform the law on appeal.  They are not entitled to a preliminary injunction in the interim, especially when the balance of equities tips decisively in favor of continuing practices which have already helped thousands of people and businesses.

## BACKGROUND

### A.      Legal and Factual Background

1. Section 1981 ensures that "all persons" have "the same right … to make and enforce contracts … as is enjoyed by white citizens."  42 U.S.C. §1981.  As its text makes clear, §1981's primary focus is preventing discriminatory contracting practices against minority races.  Indeed, based on text alone, plaintiffs—four "white citizens"—would plead themselves out of court.

 The purposes underlying that text also indicate Congress' intent to raise up recently emancipated minorities, rather than to pursue strict equality for its own sake.  Congress enacted §1981 as part of the Civil Rights Act of 1866, pursuant to its authority to implement the Thirteenth Amendment.  The law pre-dated the Fourteenth Amendment and its Equal Protection Clause and was Congress's "first attempt to ensure equal rights for the freedmen following the formal abolition of slavery."  *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982).  By protecting the right of the newly emancipated to contract—and to access and use the courts, 42 U.S.C. §1981(a), to be free from race-specific taxes and penalties, *id.*, and to own and use property, *id.* §1982—Congress thus "acted to protect the freedmen from intentional discrimination by those whose object was to make their former slaves dependent serfs, victims of unjust laws, and debarred from all progress and elevation by organized social prejudices."  *Gen. Bldg.*, 458 U.S. at 388; *see also City of Memphis v. Greene*, 451 U.S. 100, 134 (1981) (White, J., concurring) ("The Civil Rights Act of 1866 … was a response to the perception held by Congress that former slaves were being denied basic civil rights.").

In 1991, Congress amended §1981 as part of the Civil Rights Restoration Act in an effort to further protect the interests of racial minorities.  The amendments ratified the Supreme Court's holding in *Runyon v. McCrary*, 427 U.S. 160, 172 (1976), which interpreted §1981 to prohibit private discrimination, 42 U.S.C. §1981(c).  Congress also clarified that §1981 protects not only the making, modification, and termination of contracts but also "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* §1981(b).  But Congress explicitly disclaimed any intent to impinge on race-conscious efforts to erase burdens faced by racial minorities, declaring that the amendment should not be "construed to affect court-ordered remedies, affirmative action, or conciliation agreements, that are in accordance with the law." *Id.* §1981 note.  And there is no hint, in either 1866 or 1991, that Congress sought to prohibit targeted scholarships or other forms of targeted generosity.

To be sure, §1981 has been interpreted to protect the right to contract for white individuals, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976), but it still remains focused on the kinds of major deprivations of "basic civil rights" that animated the 39th Congress to enact it, *City of Memphis*, 451 U.S. at 134 (White, J., concurring).  And it remains limited to the right to contract.  As the Supreme Court has explained, "[a]ny claim brought under §1981 … must initially identify an impaired 'contractual relationship,' §1981(b), under which the plaintiff has rights." *Domino's Pizza Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  "[N]othing in the text of §1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice"—the statute's scope is "limited to situations involving contracts." *Id.* at 479.  It is thus a "classic violation of §1981" to completely exclude black students from a school, *Runyon v. McCrary*, 427 U.S. 160, 172 (1976), or to completely terminate an individual's employment contract as retaliation for whistleblowing over race discrimination, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 450-51

(2008).  But §1981 has never been understood to forbid race-conscious programs.  *See, e.g.,* *Christensen v. Equitable Life Assur. Soc. of U.S.*, 767 F.2d 340, 343 (7th Cir. 1985) (holding that §1981 does not prohibit even an "aggressive[]" affirmative action program); *Doe v. Kamehameha Schs.*, 470 F.3d 827, 849 (9th Cir. 2006) (holding that a school reserved exclusively for Native Hawaiians did not violate §1981); *Setser v. Novack Inv. Co.*, 657 F.2d 962, 968 (8th Cir. 1981) (holding that affirmative action plans do not violate §1981).  Nor has it ever been applied to forbid charitable efforts targeted at particular communities in need.

2. Congress itself has long endorsed the need to eliminate racial disparities, and has taken steps to do so.  Those efforts trace all the way back to the Freedmen's Bureau, created by Congress in 1865 as a federal agency specifically designed to protect the rights and promote the interests of newly emancipated individuals in the south.  *See* An Act to Establish a Bureau for the Relief of Freedmen and Refugees, Ch. 90, 13 Stat. 507 (Mar. 3, 1865).  Those efforts included concrete assistance programs that were available only to the "freedmen and refugees" for which the Bureau was named.  For example, the federal government assigned freedmen up to 40 acres of land, protected their use of the land, and guaranteed that their annual rent for at least three years was capped at a particular amount.  *Id.* §4, 13 Stat. at 508.  And Congress directed the government to provide "provisions, clothing, and fuel" as necessary for "destitute and suffering refugees and freedman and their wives and children."  *Id.* §2, 13 Stat. at 508.  Congress renewed the Freedmen's Bureau only three months after enacting §1981, recognizing the need to "aid" freedmen "in making the freedom conferred by [the Emancipation] [P]roclamation."  An Act to Continue in Force and to Amend "An Act to Establish a Bureau for the Relief of Freedmen and Refugees," Ch. 200, §2, 14 Stat. 173, 174 (July 16, 1866); *see also id.* §6, 14 Stat. at 175 (confirming favorable land sales to the "heads of families of the African race").

More contemporaneous examples of such targeted efforts abound.  In its 1978 amendments to the Small Business Act, Congress declared that it is "in the national interest to expeditiously ameliorate the conditions of socially and economically disadvantaged groups," defined to include "Black Americans, Hispanic Americans, Native Americans, Indian tribes, Asian Pacific Americans, Native Hawaiian Organizations, and other minorities."  15 U.S.C. §§631(f)(1)(A)-(D), 637(d)(3)(C)(ii).   To that end, the Small Business Act authorizes the Small Business Administration ("SBA") to offer "valuable 'technological, financial, and practical assistance, as well as support through preferential awards of government contracts,'" to "small businesses that socially and economically disadvantaged individuals own."  *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 188 (D.D.C. 2015), *aff'd* 836 F.3d 57 (D.C. Cir. 2016); *see* 15 U.S.C. §637.  For example, the SBA has the "duty" to "arrange for the performance of . . . procurement contracts by negotiating or otherwise letting subcontracts" to those minority groups, and to "make . . . award[s] to . . . small business concern[s] owned and controlled by" them.  15 U.S.C. §637(a)(1)(B)-(C); *see also id.* at §637(a)(5), (d)(3)(C).

Congress' efforts are not limited to the SBA.  It has established the Minority Business Development Agency ("MBDA"), which provides "financial assistance in the form of grants to minority business centers and minority chambers of commerce to provide education, training, and advising to minority business enterprises."  15 U.S.C. §9007(b)(1); *see also id.* §9007(a)(3)-(4). And the American Rescue Plan of 2021 authorizes funding for "the [MBDA] … to provide technical assistance to business enterprises owned and controlled by socially and economically disadvantaged individuals."  12 U.S.C. §5708(e)(2).  Congress has also mandated that federal contractors take affirmative efforts to subcontract with women- and minority-owned firms.  *See* 15 U.S.C. §637(d)(1).  Federal contracts above a certain threshold must include an express

provision requiring the contractor "to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract." *Id.* §637(d)(3)(B). And agencies must select federal contractors who will provide "the maximum practicable opportunity" for women- and minority-owned businesses and are empowered "to provide such incentives" as appropriate to encourage the award of sub-contracting opportunities to such firms. *Id.* §637(d)(4)(D), (E). These initiatives are just the tip of the iceberg, as other federal statutes promote the same interests. *See, e.g.*, 12 U.S.C. §5452 (requiring agencies to establish an "Office of Minority and Women Inclusion" that, *inter alia*, develops standards for increased participation for minority-owned businesses in federal programs).

3. For more than a century, American businesses and other organizations have also worked to mitigate racial disparities through race-conscious measures that have long been understood to complement, rather than violate, federal and state civil rights statutes. In the years following the Civil War, for example, numerous philanthropic entities awarded grants exclusive to freedmen who sought assistance. *See, e.g.*, M. Work, *Negro Year Book and the Annual Encyclopedia of the Negro* 178-85 (1913) (listing a variety of private educational charities for black citizens initiated in the 19th century). And today, as then, longstanding charitable organizations direct charitable dollars, from corporations and otherwise, to underserved racial minorities. *See, e.g.*, *Scholarships*, NAACP (last visited May 10, 2022), https://bit.ly/3rCloPv (offering scholarships to people of color); *African American Scholarships*, Scholarships.com, https://bit.ly/3vku1PT (last visited May 10, 2022) (listing dozens of scholarships reserved for black students). The American Bar Association, presumably fully versed in the applicable law, provides a "Legal Opportunity Scholarship" to "member[s] of a racial and/or ethnic minority that has been underrepresented in

the legal profession." *2022 Legal Opportunity Scholarship Fund*, Council for Diversity in the Educ. Pipeline, Am. Bar Ass'n, https://bit.ly/39F6u4Y (last visited May 10, 2022).

Private companies have also focused resources on sponsorship and other philanthropic efforts aimed at closing racial gaps. MasterCard's "Fearless Strivers" grant program, for example, provides $10,000 grants and other services to assist small businesses owned by Black women. *See Fearless Strivers Grant Contest*, MasterCard Fearless Fund, https://bit.ly/3vxIKIk (last visited May 10, 2022) (*"Fearless Strivers"*). JP Morgan Chase established a center focused on providing Black business owners and entrepreneurs resources and specialized events to "help level the economic playing field." *Advancing Black Entrepreneurs*, JP Morgan Chase & Co., https://bit.ly/38euA65 (last visited May 10, 2022). And a coalition of companies such as American Express and AIG jointly announced a "multi-year initiative" to provide "over $14 million in grants, training, and resources to Black-owned small businesses." *Coalition to Back Black Businesses*, U.S. Chamber of Commerce Found., https://bit.ly/3kyeaIA (last visited May 10, 2022). Similarly, Apple and Amazon have established business accelerator programs that provide resources and guidance to minority-owned businesses. *See, e.g.*, Press Release, *Apple Selects 15 Black- and Brown-owned Businesses for First-of-its-kind Impact Accelerator*, Apple (Aug. 17, 2021), https://apple.co/38JcyZv; *Black Business Accelerator*, Amazon, https://amzn.to/3ku8krA (last visited May 10, 2022).

These efforts took on special significance following the COVID-19 pandemic and other contemporaneous events, including the murder of George Floyd, all of which disproportionately affected minority communities—and minority small businesses, in particular. At the outset of the pandemic, "the number of active Black-owned businesses declined by 41%, Latinx-owned businesses declined by 32%, and Asian-owned businesses dropped by 25%, versus just 21% for

the general population." Complaint, Dkt. 1 ¶15, at 5-6; Robert W. Fairlie, *The Impact of Covid-19 on Small Business Owners* 9 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27309, 2020). These gaps have persisted throughout the pandemic. *See, e.g.*, Jennifer F. Helgeson et al., *Natural Hazards Compound COVID-19 Impacts on Small Businesses Disproportionately for Historically Underrepresented Group Operators*, 72 Int'l J. of Disaster Risk Reduction 1, 9 (2022).

In the wake of these events, charities and private companies redoubled their efforts to close racial achievement gaps. These initiatives were legion. Ford partnered with established nonprofits to distribute grants to minority-owned businesses. *Ford and National Urban League Launch $600,000 Initiative to Help Black Small Business Owners Hit Hardest by COVID-19*, Ford Media Ctr. (July 14, 2020), https://ford.to/3KPVE9e. PepsiCo started the Juntos Crecemos program, which provides struggling Hispanic-owned small businesses with financial grants and consulting services. *Frequently Asked Questions*, PepsiCo Juntos Crecemos, https://bit.ly/3kRVxiT (last visited May 10, 2022). Visa announced grants that prioritized applications from minority-owned businesses. *Grants for Growth*, LISC https://bit.ly/3yjW3Oo (last visited May 10, 2022). And PayPal announced a multi-million dollar grant program for Black-owned businesses. *PayPal Empowerment Grant for Black Businesses*, Impact AEO30, https://bit.ly/3st2o6C (last visited May 10, 2022). These companies are hardly alone in targeting relief to minority communities. The National Football League expanded its social justice initiative through a "10-year total $250 million fund to combat systemic racism and support the battle against the ongoing and historic injustices faced by African-Americans." *Expanded Social Justice Commitment*, Nat'l Football League (June 11, 2020), https://bit.ly/3kU0oA6. The list goes on. *See also, e.g.*, *Charter Invests $10 Million with National Urban League and National Action Network to Assist Black-Owned Small Businesses in Underserved Communities*, Charter Commc'ns (June 11, 2020),

https://bit.ly/3uN8kIY; Alisa Gumbs, *Verizon Announces $10K Grants for Hundreds of Minority Small Businesses*, Black Enter. (May 1, 2020), https://bit.ly/3KQucZL ("Of the recipients, 62% are women-owned businesses [and] 96% are minority-owned …."); Leanna Tilitei, *How 5 of Philadelphia's Fortune 500 Companies Are Working To Support Minority-Owned Businesses*, Phil. Bus. J. (July 1, 2021), https://bit.ly/3MgxWUw.

By virtue of relying on applications to distribute funding, these charitable programs virtually all make requests of applicants and seek their agreement to different ancillary terms in various ways. Microsoft's "Blacks at Microsoft Scholarship," for example, requires applicants to write multiple essays, secure letters of recommendation, and provide additional documentation to be considered. *See Blacks at Microsoft Scholarship*, Microsoft, https://bit.ly/3LvZQMm (last visited May 10, 2022). Beyond applications, grant and scholarship programs commonly require applicants or recipients to consent to various ancillary terms related to the program like liability waivers and publicity releases. As one example, MasterCard's Fearless Strivers grant program requires applicants to agree to "indemnify, defend and hold harmless" the company and also to grant a "perpetual, non-exclusive, royalty-free, no-cost, worldwide, irrevocable right and license" for the company to use the application and "all images, text and materials" in "any manner or medium." *Official Rules*, Fearless Strivers Fund, https://bit.ly/3sqJWLM (last visited May 10, 2022). As another example, the Society of Asian Sciences and Engineers offers a scholarship program that requires all applicants to agree that the society may use their "information for research purposes." *SASE Scholarship Program Terms and Conditions*, Society of Asian Scis. & Eng'rs (Mar. 5, 2022), https://bit.ly/3KxFsJl. And all recipients must agree that the society may use their "name, image, likeness, voice and/or spoken or written words" to, among other things, "promot[e] SASE or its Scholarship Program, its activities or accomplishments." *Id.*

4.  For its part, Comcast responded to the pandemic by committing nearly $200 million to assisting consumers and small businesses without regard to race.  Ward-Maupin Decl., Ex. 1 ¶4. For low-income customers, it liberalized the terms of its already subsidized service offering, created a program that allowed schools to distribute subsidized internet to their students, and established free internet "zones" for students and others in community centers across the country. Ex. 1 ¶4.  Comcast also assisted both business and residential customers hard hit by COVID in several ways—including allowing customers to stay connected even if they failed to pay their bills, creating special, low-priced offerings for customers struggling to pay their pre-existing bills, and offering generous, extended re-payment terms—through the Comcast Business Assistance Program (for businesses) and the Xfinity Assistance Program (for residential customers).  Ex. 1 ¶4.

Comcast also committed $100 million to advance social justice and equality.  One of the programs those charitable dollars funded—at issue here—is the Comcast RISE program, which the company launched to aid groups "hit hardest by the effects of the pandemic."  *FAQ*, Comcast RISE, https://bit.ly/3uJUF5v (last visited May 10, 2022) ("*RISE FAQ*"); *see* Dkt. 1 ¶14, at 5.  To carry out that purpose, the RISE program limits the application pool to small businesses that have been in operation for at least a year, are independently owned and operated, and are majority owned by a racial minority or (more recently) a woman.  RISE grant recipients receive some of Comcast's ordinary business services, such as marketing consultation or technology upgrades, at no cost. Dkt. 1 ¶24, at 8-9; *RISE FAQ, supra.*[1]  Comcast offers every service it provides through the RISE

---

[1]    Comcast operates a separate program through RISE that awards monetary grants to small businesses in select cities. *See About*, Comcast Rise, https://bit.ly/3EpFWzS (last visited May 10, 2022).  None of the plaintiffs resides in an eligible city, and they do not allege that this grant program is at issue.

program commercially or through other initiatives to all small businesses without regard to race. Ex. 1 ¶7. Those programs include the Comcast Business Assistance Program started in the wake of COVID, as well as other small-business-focused programs that provide counseling and other support, such as the LIFT Labs initiative, which helps incubate and advise new small businesses. *See id.* ¶¶4, 8.

Comcast awards RISE grants on a rolling basis—a new application window opens "immediately" after the application deadline for the preceding round. *RISE FAQ*, *supra*. The round beginning in January 2022 is set to close on June 17. As part of its long-term plan for the RISE program, Comcast has gradually expanded the program, most recently extending eligibility to women-owned small businesses for the current round of grants. *Comcast RISE Announces Major Expansion to All Women-Owned Businesses Nationwide Starting in 2022*, Comcast (Nov. 23, 2021), https://comca.st/36kIPpd.

Targeted programs like RISE are sufficiently common that a number of companies have been established that specialize in administering such programs. After interviewing a number of these specialized third-party vendors, Comcast selected IFundWomen, an organization dedicated to supporting and providing capital to businesses owned by women and, in particular, women of color, to manage the application process. Ex. 1 ¶16. IFundWomen specializes in collaborating with corporations to implement programs focused on underserved small business owners, specifically; its "mission is to close the funding gap for women-owned businesses." *About Us*, IFundWomen, https://bit.ly/3sqOC4m (last visited May 10, 2022). Comcast and IFundWomen jointly determine which applications meet the objective eligibility requirements for RISE grants, such as business size and location. IFundWomen then selects recipients from eligible applicants. Ex. 1 ¶11. Comcast does not select individual award recipients. *Id.* Since its inception, the RISE

program has awarded grants to nearly 8,000 small businesses without regard to whether they were or would become Comcast customers.  *Recipients*, Comcast RISE (last visited May 10, 2022), https://bit.ly/3JVM5VS; *Apply*, Comcast Rise (last visited May 10, 2022), https://bit.ly/3uP6YxF; *RISE FAQ*, *supra*.

The terms and conditions of the RISE program are typical of charitable programs. Although they detail the program's normal operations, they ensure that Comcast's only obligations arising out of the program are philanthropic, rather than legal.  Specifically, they give Comcast "the right to cancel, modify, or suspend the [program] or any element thereof (including, without limitation, these Official Rules) without notice in any manner and for any reason (including, without limitation, in the event of any unanticipated occurrence that is not fully addressed in these Official Rules)."  *Official Contest Rules*, Comcast RISE, https://bit.ly/386MZlp (last visited May 10, 2022).  And as part of the program rules, RISE requires applicants to agree to ancillary terms such as publicity and liability releases, another customary feature of philanthropic programs like RISE.

### B.   Procedural History

Plaintiffs are four white, male small business owners—Themi Sacarellos, Antonio Vitolo, Alfred Castiglioni, and Christopher Moses—who filed this suit on the ground that the RISE program violates 42 U.S.C. §1981.  *See* Dkt. 1 ¶4, at 2; Dkt. 2.  Sacarellos, Vitolo, and Castiglioni own restaurants; Moses owns a commercial cleaning company.  Dkt. 1 ¶¶6-9, at 3.  All four plaintiffs have Comcast accounts, with three holding business accounts.  Padgett Decl., Ex. 2 ¶4.

After learning about the RISE program "[e]arlier this year," all four plaintiffs decided that they wanted access to money that Comcast has earmarked for businesses hit hardest by the pandemic.  Dkt. 1 ¶¶1-2, 37, at 1-2, 11.  Yet plaintiffs do not allege that the pandemic has uniquely damaged their businesses, nor do they allege that they are seeking assistance through any of the

other programs that Comcast offers to help customers experiencing economic hardships without regard to race.  They do not even explain why they need Comcast's philanthropy to receive services that are available to them commercially.  They instead allege only that the RISE program sounds like a "great opportunity" for their businesses, at least one of which is thriving with "multiple successful restaurants."  Dkt. 1 ¶¶2, 7, at 2-3.  Plaintiffs seek, along with other remedies, both actual and punitive damages.  *See* Dkt. 1 at 11.

Despite the possibility of a damages remedy and the absence of any sense of urgency in participating in the program, plaintiffs nevertheless filed a motion for preliminary injunction at the same time they filed their complaint, asking this Court to rule before the conclusion of the current round of RISE on June 17.  Neither party has requested discovery or an evidentiary hearing on the issues presented in plaintiffs' motion.

## SUMMARY OF ARGUMENT

Plaintiffs fail to satisfy any, much less all, of the preliminary injunction factors.  Plaintiffs are extraordinarily unlikely to prevail on the merits of their novel claim, as §1981 does not and has never been understood to forbid targeted charitable programs like RISE.  Plaintiffs do not dispute that Comact contracts with individuals of all races in the provision of its basic services.  Plaintiffs' only claim is that §1981 entitles it to the benefits of Comcast's charitable efforts to reach minority-owned small businesses that were disproportionately affected by the pandemic.  But Comcast's targeted generosity through its RISE program does not implicate §1981.  As is characteristic of countless philanthropic initiatives, Comcast's obligations with respect to the RISE program follow from its charitable commitment, not from any legally enforceable contract right.  That grant recipients agree to limit Comcast's liability and grant the company rights with respect to their likeness does not change the fundamental character of the program as an act of charity, not commercial exchange.  And even if §1981 somehow were to implicate the RISE program (it does

not), strict scrutiny would not apply, as the Seventh Circuit has repeatedly held, and plaintiffs do not even meaningfully argue that the program would be impermissible under any other standard of scrutiny.  In short, plaintiffs would need to change the law to prevail in this case, and they are not entitled to a preliminary injunction while they seek to convince appellate courts to vastly expand §1981.

Plaintiffs fare no better under the remaining factors for a preliminary injunction.  They offer no particularized need for Comcast's charity, much less on an expedited basis necessitating a preliminary injunction.  They seek damages relief, which is the classic form of relief in a §1981 case.  Moreover, even if plaintiffs ultimately prevail, they are not likely to gain access to the RISE program, but will instead likely just cause a targeted charitable to shutter for everyone.  Given the expressed mission of the RISE program and the difficulties of converting it into a broader, much larger general small business grant program, Comcast would almost certainly simply discontinue the program rather than entirely rework it to include plaintiffs.  Thus, unlike a case seeking to open up a business' core offerings to everyone, plaintiffs' effort to render targeted generosity unlawful will not give them access to the RISE program and would only make everyone worse off.  Nor can plaintiffs establish irreparable harm based on their claim of "ongoing racial discrimination," Dkt. 3 at 16, as this Court and the Seventh Circuit have repeatedly held that alleged violations of the federal civil rights statutes do not satisfy the irreparable harm standard as a matter of law.  For many of the same reasons, the balance of equities weighs decisively against plaintiffs.  And the public interest also weighs in favor of denying plaintiffs' motion and maintaining the status quo, as the public interest *favors* the targeted generosity of private companies, and in particular efforts to level the playing field for racial minorities in the wake of the pandemic and other events that hit those communities the hardest.

## ARGUMENT

A "preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020). Accordingly, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Nat. Resources Def. Counsel, Inc.*, 555 U.S. 7, 20 (2008)).   For the reasons set forth below, plaintiffs cannot make the required "clear showing" that they satisfy any of these elements—much less each one. *Payton v. Walsh*, 2022 WL 80317, at *2 (S.D. Ind. Jan. 7, 2022) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see Orr*, 953 F.3d at 501.   This Court should deny plaintiffs' motion.

## I.    Plaintiffs Are Unlikely To Succeed On The Merits Of Their §1981 Claim.

### A.    Comcast's RISE Program Does Not Implicate §1981.

Plaintiffs' effort to shoehorn Comcast's targeted generosity through its RISE program into a §1981 violation fails at every turn.   Congress enacted §1981 to ensure that freed slaves had "the same right" to contract as "white citizens."   42 U.S.C. §1981.   The seminal §1981 cases thus involve actions like the wholesale denial to admit black students into an educational institution, *e.g.*, *Runyon*, 427 U.S. at 173, and the outright discharge of black employees, *e.g.*, *CBOCS*, 553 U.S. at 450-51.   As these cases reflect, the principal concern of §1981 was ensuring that companies did not deny black citizens the same ability to contract as white citizens.   *See Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 301 (7th Cir. 2000) ("[T]he statute … reflects the exercise of congressional authority under the Thirteenth Amendment to relieve African Americans of the 'badges and incidents' of slavery.").   And while the Supreme Court has extended the protections of §1981 to white citizens as well, *see McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295

15

(1976), §1981 is and has always been about the denial of rights—not a right to another person's generosity. *See Domino's Pizza*, 546 U.S. at 476 (holding that §1981's threshold requirement is the existence of "an 'impaired contractual relationship'"); *see also Kyles*, 222 F.3d at 303 ("Section 1981 … does not proscribe any practice that might tend to interfere with one's ability to enter and enforce a contract; it protects the right to enter into and preserve a contractual relationship, period.").

There can be no serious question that Comcast has opened its business to all races and in fact contracts with all races in the ordinary course. It welcomes all customers, both business and residential, on a non-discriminatory basis. Plaintiffs do not allege (because they cannot) that Comcast refuses to contract with white individuals or business owners generally. Plaintiffs do not allege (because they cannot) that the services Comcast makes available through its RISE initiative are available *only* through that program. And plaintiffs do not allege (because they cannot) that Comcast has refused to contract with *them* for those services because of their race. In fact, all four plaintiffs are Comcast customers, and three hold business accounts. Ex. 2 ¶4.

Plaintiffs nevertheless contend that §1981 entitles them to the benefits of Comcast's targeted generosity directed to minority-owned small businesses, which were uniquely impacted by the COVID-19 pandemic and other contemporaneous events. Although §1981 has been on the statute books since 1866, plaintiffs have not been able to point to a single case that stands for the proposition that §1981 entitles someone not just to the services a company offers, but also to their generosity. We are not aware of any such case. *See Doe*, 470 F.3d at 889 (Kozinski, J., dissenting) (noting without disagreement the absence of any "case where section 1981 has been applied to a charity" and concluding that charitable programs are likely "not … 'contractual' as that term is used in section 1981"); *see also United Steelworkers v. Weber*, 443 U.S. 193, 204 (1979)

16

(concluding that interpreting Title VII to prohibit affirmative action would make the Act "the *first* legislative prohibition*" of private, race-based remedial efforts). That is because hornbook contract law distinguishes between charitable promises and enforceable commercial contracts, with §1981 addressed only to the latter. Thus, a plaintiff may invoke the protections of §1981 only if he has "rights under the contractual relationship." *Domino's*, 546 U.S. at 476.

The Comcast RISE program—like countless other charitable and philanthropic initiatives—is a classic charitable program that confers no contractual rights upon applicants or grant recipients. It is well-settled that a promise that "by its terms makes performance entirely optional with the promisor … cannot form the basis for a valid contract." *Penn v. Ryan's Fam. Steak Houses, Inc.*, 269 F.3d 753, 759 (7th Cir. 2001); *accord, e.g.*, 3 *Williston on Contracts* §7:7 (4th ed.) ("[W]here the promisor may perform or not, solely on the condition of his whim, his promise will not serve as consideration."); Restatement, *supra*, §§2 cmt.e, 77 cmt.a (same); *Gensinger Clinic v. Di Cuccio*, 606 A.2d 509, 512 (Pa. Super. Ct. 1992) (same).[2]  In other words, where nothing prevents a party "from instituting a new system of [grants] at any time," or from "changing the rules and procedures as the company sees fit," there is no legally enforceable contract right conferred on the other side. *Druco Restaurants, Inc. v. Steak N Shake Enters., Inc.*, 765 F.3d 776, 783 (7th Cir. 2014); *accord, e.g.*, *Penn*, 269 F.3d at 759-60 (holding that no contract existed where one party had "sole, unilateral discretion to modify or amend" the terms of the agreement); *Barton v. Hewlett-Packard Co.*, 635 F. App'x 46, 48 (3d Cir. 2015) (holding that "no contract [was] formed" under "hornbook Pennsylvania law" when a party "reserved the right to

---

[2]     Pennsylvania law governs the program's terms and thus is the state whose law can inform the applicability of §1981 to particular cases. *See Walker v. Abbott Lab'ys*, 340 F.3d 471 (7th Cir. 2003).

'adjust the terms of the [agreement] or to cancel it at any time … with or without notice at any time'").

As with many charities, Comcast makes clear that its commitment to minority-owned small businesses in the wake of the pandemic and current events is compelled by its values, not by the law.  The RISE program includes extensive reservations of rights establishing that its terms do not rise to the level of an enforceable contract:  Comcast has "reserv[ed] the right to cancel, modify, or suspend the [program] or any element thereof (including, without limitation, the[ program's] Official Rules) without notice in any manner and for any reason (including, without limitation, in the event of any unanticipated occurrence that is not fully addressed in these Official Rules)." *Official Contest Rules*, Comcast RISE, https://bit.ly/386MZlp (last visited May 10, 2022).  That language—giving Comcast unrestricted discretion not to perform "without limitation," "without notice" and for "any reason" it wishes, and allowing Comcast to change any program rules at any time—is "an absolutely classic description" of a promise that does not confer an enforceable contract right on the other side, *United States v. Winstar Corp.*, 518 U.S. 839, 921 (1996) (Scalia, J., concurring), thus precluding plaintiffs from "identify[ing] an impaired contractual relationship." *Domino's Pizza*, 546 U.S. at 476.

Plaintiffs seem to recognize that the RISE program at its core is just like many other charitable programs, asking this Court to recognize contract rights in ancillary terms of the program that require grant recipients to "execute and return an affidavit of eligibility, release of liability [and] publicity release."  Dkt. 1 ¶25, at 9.  Indeed, the entire basis for plaintiffs claiming that the RISE grants "are legal contracts" is because "in exchange" for Comcast awarding a grant, "the recipient signs over certain rights related to publicity and promotion."  Dkt 3 at 1.  But those ancillary terms do not convert an act of charity into an enforceable contract precisely because they

say nothing at all about Comcast's legal obligations, which are governed by its reservation of rights. But even setting aside the broad reservations, those ancillary terms are at most "incidental or conditional" to the grant recipient's "receipt of the benefit." *Pennsy Supply, Inc. v. Am. Ash Recycling Corp. of Penn.*, 895 A.2d 595, 601 (Pa. Super. 2006) (detriment suffered by a party is not consideration if it was "incidental or conditional to the promisee's receipt of the benefit"). It is black-letter law that a donor can attach conditions to a gift without converting that act of generosity into a legally enforceable contract. *See Weavertown Transp. Leasing, Inc. v. Moral*, 834 A.2d 1169, 1171 (Pa. Super. 2003).

These features are commonplace in charitable giving. Countless companies and organizations enter into agreements with grant and scholarship participants in which they confirm through reservations of rights that their commitments are driven by their values, not by the law. The National Merit Scholarship Corporation, for example, includes in its terms and conditions "the right at any time … to modify or discontinue, temporarily or permanently" the scholarship—or any other service it provides on its website—"with or without notice." *Terms of Use*, National Merit Scholarship Corp., https://bit.ly/3ErYuQb (last vitited Apr. 19, 2022). So does the Rhodes Scholarship. *See Rhodes Scholarship Information for Candidates for the USA*, Rhodes Trust, https://bit.ly/3vvaKev (last visited May 10, 2022) ("The Rhodes Trust reserves the right to vary these conditions at any time without notice."). And the practice is not limited to scholarships. As just one example, Disney's charitable giving efforts include a broad reservation of rights— reserving the right to "change, suspend, revoke, or terminate its charitable giving at any time"— and makes clear that the terms "may be modified at any time without advance notice" and that the company can deviate from them "at its own discretion." *Global Charitable Giving Guidelines*, The Walt Disney Co. (Mar. 2022), https://bit.ly/3vA8S5j (last visited May 10, 2022).

Grant and scholarship programs also routinely include releases similar to those required by the RISE program.  MasterCard's program providing $10,000 grants and other services to small businesses owned by black women includes both liability and publicity releases.  *See supra* p. 9. So, too, does Visa's grant program.  *Grants for Growth*, LISC https://bit.ly/3yjW3Oo (last visited May 10, 2022).  And the Society of Asian Sciences and Engineers' scholarship program requires all applicants to agree to a publicity release.  *See supra* p. 9.  These ancillary agreements do not change the fundamental character of the charitable gift.

Plaintiffs' theory would in one fell swoop turn countless acts of charity into legally enforceable contracts, all the while rendering those that seek to help certain racial groups illegal under §1981.  It would call into question all manner of targeted generosity from corporate efforts to assist hard-hit communities with long-established scholarships.  Indeed, plaintiffs would interpret §1981 at cross-purposes with the contemporaneous efforts of the Freedmen's Bureau. But nothing in the text or manifest purpose of §1981 countenances that counterintuitive result. The office of §1981 is and has always been ensuring that citizens have the right to contract with businesses regardless of their race.  It does not exist to provide a remedy for individuals seeking access to someone else's charity.  Under a straightforward application of §1981, the Court should deny plaintiffs' motion on the ground that Comcast's targeted generosity through its RISE program does not fall within the scope of §1981.

### B.    Plaintiffs' Claim Fails Even If It Implicates §1981.

Even if plaintiffs somehow could establish that Comcast's targeted charitable efforts confer cognizable contract rights in applicants, they still cannot prevail.  Plaintiffs' singular theory is that Comcast's RISE program cannot satisfy strict scrutiny—a standard that restricts the *government's* ability to violate *constitutional* guarantees.  But, as plaintiffs seem to acknowledge, *see* Dkt. 3 at 15 n.3, the Seventh Circuit has clearly and consistently held that the Title VII framework—not

20

strict scrutiny—applies to §1981 claims, *see, e.g., Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 669-70 (7th Cir. 1996) ("[T]he substantive standards governing liability for §1981 claims and Title VII disparate treatment claims are identical."), including when considering race-conscious remedial programs, *see, e.g., Christiansen,* 767 F.2d at 344; *Lehman v. Yellow Freight Sys., Inc.*, 651 F.2d 520, 525-26 (7th Cir. 1981).[3]

Faced with this wall of precedent, plaintiffs try to make strained inferences from Supreme Court cases that are inapposite, and none supports their position.  In *Gratz v. Bollinger*, 539 U.S. 244 (2003), and *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Supreme Court concluded in passing that because the government policies at issue violated the Equal Protection Clause, they likewise violated §1981.  *Gratz*, 539 U.S. 244 & n.23; *Grutter*, 539 U.S. at 343.  That result is unremarkable, given that strict scrutiny is an unambiguously *higher* standard than the flexible analysis required by Title VII and §1981.  *See Johnson v. Transp. Agency*, 480 U.S. 616, 630 n.8 (1987); *see also Doe*, 470 F.3d at 839 ("In *Grutter* and *Gratz*, cases involving state action, the schools perforce did not argue that their programs satisfied §1981.  The Court in *Grutter* and *Gratz* simply did not consider the question [of §1981's standards].").  And in all events, that says nothing about whether the higher standard *in fact* applies in §1981 cases.  Nor does *Grutter*'s citation to *General Building Contractors*, 458 U.S. 375, including the parenthetical that §1981 is "co-extensive" with the Equal Protection Clause, compel a different conclusion, 539 U.S. at 343.  *General Building Contractors* held that §1981 is co-extensive with the Equal Protection Clause by requiring *purposeful discrimination*, not that it required strict scrutiny.  *See* 458 U.S. at 389.

---

[3]     *See also Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999) ("While a valid affirmative action plan serves as a defense to an action under section 1981, the standard for evaluating the validity of a plan is identical to the standard developed in Title VII cases."); *Doe*, 470 F.3d at 839; *Setser*, 657 F.2d at 965-68; *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 (11th Cir. 1999); *Edmonson v. U.S. Steel Corp.*, 659 F.2d 582, 584 (Former 5th Cir. Unit B 1981).

Nor would it make any sense to apply strict scrutiny to purely private conduct under §1981. Dkt. 3 at 11-13.  Private companies are not generally in the business of promoting compelling "governmental interest[s]."  *Grutter*, 539 U.S. at 323.  That is a non-sequitur.  And plaintiffs' position that §1981 requires strict scrutiny would eliminate the availability of affirmative action programs under Title VII, which almost always involves contractual relations between employers and employees, and which §1981 expressly contemplates.  *See supra* p. 4; *Doe*, 470 F.3d at 858 (Bybee, J., dissenting) ("I agree that Title VII standards … must apply to §1981 because to hold otherwise would effectively render the Title VII's provisions that expressly contemplate affirmative action nonsensical.").  Indeed, plaintiffs' theory rests on the premise that the Supreme Court enacted a sea change in employment-discrimination law, functionally overruling its seminal decision in *Weber*, through a one-line parenthetical at the end of an inapposite opinion.

Moreover, plaintiffs' position would raise serious First Amendment concerns.  In sharp contrast to its treatment of commercial contracting, the Supreme Court has long held that charitable solicitation and giving implicates the First Amendment.  *See, e.g.*, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 787-88 (1988).  These transactions are not "commercial [in] character" because they are "inextricably intertwined with … fully protected speech" of advocating for causes and ideals.  *Id.* at 796.  Thus, even conduct-heavy actions like setting up donation boxes constitute protected speech because that conduct "implicitly advocate[s] for that charity's views, ideas, goals, causes, and values."  *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 212-13 (5th Cir. 2011); *accord, e.g.*, *Planet Aid v. City of St. Johns*, 782 F.3d 318, 325 (6th Cir. 2015).  Comcast's charitable giving directed to minority-owned small businesses during this critical time in world history is—like all other donations—"a general expression" of the company's "views" and its desired "affiliat[ions]."  *McCutcheon v. FEC*, 572 U.S. 185, 203 (2014); *see Boim v. Quranic*

22

*Literacy Inst. & Holy Land Found. for Relief & Dev.*, 291 F.3d 1000, 1026 (7th Cir. 2002) (recognizing First Amendment implications of a statutory prohibition on providing material support to terrorism); *cf. Janus v. Am. Fed'n of State, Cnty. & Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) ("[T]he compelled subsidization of private speech seriously impinges on First Amendment rights …."). Comcast's advocacy for racial justice would lose substantial expressive force if the company did not place its money where its mouth is. This Court should not adopt a theory that would severely burden, if not eliminate, Comcast's ability to direct its charitable giving in the manner it sees fit.

When shorn of the premise that strict scrutiny applies, plaintiffs have no argument that the RISE program violates §1981. They do not argue that the program would fail to satisfy one of the lesser tiers of constitutional scrutiny (and for good reasons, as those, too, would be inapplicable to purely private conduct). Nor do they make any real attempt to satisfy the governing standard in this Circuit, relegating their "argument" to a single sentence in a footnote, in which they contend that the RISE program's eligibility requirements constitute "direct evidence of intentional discrimination." Dkt. 3 at 15 n.3. But the Seventh Circuit has rejected this precise claim, holding that "a lawful affirmative action program is not evidence of discrimination against the majority." *Christensen*, 767 F.2d at 343. And plaintiffs make no effort to establish that the RISE program is an unlawful remedial program under §1981's more flexible standards. *See, e.g., Doe*, 470 F.3d at 843 (rejecting §1981 challenge to private school that excluded all non-native Hawaiians based on the school's mission to correct racial disparities in the state). Thus even if §1981 were implicated, plaintiffs are unlikely to succeed on the merits of their claim.

In short, this case appears to be a considered effort by plaintiffs to get the appellate courts to *change* the law and adopt strict scrutiny for claims under §1981. That is certainly plaintiffs'

prerogative.  But plaintiffs are not entitled to the benefit of a preliminary injunction while they pursue their quest to change the law on appeal.  On the law as it now stands, plaintiffs are unlikely to succeed on the merits.

## II.    Plaintiffs Fail To Establish Irreparable Injury.

Even setting aside the lack of merit of their claims, plaintiffs cannot establish irreparable injury as a matter of law.  Plaintiffs seek damages, which are the classic form of relief in a §1981 action.  And they cannot show any extraordinary need for access to Comcast's entirely voluntary charity.  Under settled law, Comcast is free to correct any disparities in the administration of its RISE program by "equaliz[ing] up" or "equaliz[ing] down," with the latter leaving plaintiffs "no better off" with an injunction than without one.  *Ill. Repub. Party v. Pritzker*, 973 F.3d 760, 771 (7th Cir. 2020).  When a party seeks non-discriminatory access to the core offerings of a business under §1981, the only real option for an unsuccessful defendant may be to level up and make the core offerings available to all.  But the dynamic is different when it comes to charitable programs. Even in the unlikely event that plaintiffs prevailed on the merits, they would only succeed in making others worse off, especially given the specific purpose and design of the RISE program. Here, even if plaintiffs prevail, Comcast would likely comply with an equal-treatment injunction by leveling down and suspending or discontinuing the RISE program.  Comcast developed the program for the express and specific purpose of aiding minority-owned small businesses, and it developed the support, logistics, and promotion of the program accordingly—from choosing internal funding sources to partnering with a specialized vendor, to developing targeted publicity materials and promotional plans.  It would be burdensome and impractical to rework the RISE program to open it to all small businesses, not to mention out of step with the purpose of the program.  Thus, unlike a case seeking to open up a Comcast's core business offerings to all comers,

plaintiffs' effort to render Comcast's targeted generosity unlawful will not give them access to the RISE program and would instead make everyone worse off.

To be sure, plaintiffs claim that allowing the program to continue in its current form would cause them to suffer irreparable harm from "ongoing race discrimination." Dkt. 3 at 16. But that claim is squarely foreclosed by precedent, as allegations of racial discrimination—even where presumed true—do not establish irreparable injury as a matter of law. *See Bedrossian v. Nw. Mem'l Hosp.*, 409 F.3d 840, 844 (7th Cir. 2005) (recognizing that irreparable harm is not presumed in suits under Title VII notwithstanding its "ambitious congressional purpose" of eliminating discrimination). As this Court has noted, injunctive relief "pending a trial on the merits, even in cases of race or sex discrimination, is an extraordinary remedy permissible only upon a substantial showing of irreparable injury." *Payton*, 2022 WL 80317, at *5; *see also, e.g.*, *Hetreed v. Allstate Ins. Co.*, 135 F.3d 1155, 1158 (7th Cir. 1998) ("Many of our cases have held that interlocutory relief in employment-discrimination cases should be rare. Indeed, we have yet to decide a case holding that it is appropriate.").

The Seventh Circuit's decision in *Adams v. City of Chicago*, 135 F.3d 1150 (7th Cir. 1998), is instructive. There, hundreds of minority police officers claimed that the Chicago police department discriminated against them on the basis of race in violation of §1981 through the test it used to determine promotions. *Id.* at 1152-53. The district court denied the officers' ensuing motion for a preliminary injunction, finding that they had not established irreparable harm. *Id.* at 1154. The Seventh Circuit affirmed, recognizing that the department's ongoing failure to promote the officers due to racial animus did not constitute irreparable harm as a matter of law. *Id.* at 1155; *see also, e.g.*, *Ekanem v. Health & Hosp. Corp. of Marion Cnty.*, 589 F.2d 316, 322 (7th Cir. 1978) (holding that district court abused its discretion when it found irreparable harm in a race-

discrimination suit); *Hetreed*, 135 F.3d at 1158 (holding that a plaintiff failed to establish irreparable harm in a sex-discrimination suit).

Plaintiffs simply ignore this precedent, pointing instead to out-of-circuit and inapposite decisions standing for the proposition that "irreparable injury is presumed when *the government* discriminates on the basis of race." Dkt. 3 at 17 (emphasis added). But those decisions all involved allegations of discrimination by the *government*, and claims of equal-protection violations under the *Constitution*. To state those facts are to distinguish them. *See Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) (recognizing the "essential dichotomy set forth in the Fourteenth Amendment" between state action and private conduct).

Plaintiffs are thus wrong to suggest that "the same principles of irreparable harm apply to private" activities. Dkt. 3 at 17. In contrast to violations of constitutional rights, whether courts presume irreparable harm in the context of statutory violations depends entirely on whether a particular statute provides a "necessary and inescapable inference that Congress intended for plaintiffs under that statute to obtain preliminary relief without showing irreparable harm." *Bedrossian*, 409 F.3d at 843. Otherwise, "traditional equitable principles," which "do not permit" categorical presumptions of irreparable harm, govern. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393-94 (2006) (rejecting presumption of irreparable harm that applied in all but "unusual" cases). Because §1981 does not mention injunctive relief, it does not and cannot abrogate traditional equitable principles. *See id.* at 392-93 (holding that a statute explicitly granting discretionary authority to issue injunctions did not displace traditional equitable principles). That is precisely why the Seventh Circuit has repeatedly denied injunctions to plaintiffs who fail to show particularized harm in race-discrimination suits. *See, e.g.*, *Adams*, 135 F.3d at 1154; *Ekanem*, 589 F.2d at 322.

The lone appellate decision plaintiffs cite to support their contrary view held only that irreparable harm is presumed under certain fair housing statutes that explicitly "authorized" injunctive relief—relief that is not mentioned in §1981 even after the 1991 amendments. *Gresham v. Windrush*, 730 F.2d 1417, 1423 (11th Cir. 1984); *see also id.* at 1424 (discussing the uniquely irreparable harms that are common in the context of housing discrimination). *But see*, *e.g.*, *Daveri Dev. Grp., LLC v. Vill. of Wheeling*, 935 F. Supp.2d 987, 1007 (N.D. Ill. 2013) (distinguishing *Gresham* and declining to presume irreparable harm under a related housing statute). And the trio of district court decisions they cite are simply irrelevant. One did not even consider irreparable harm, *Lewis v. Greyhound Corp.*, 199 F. Supp. 210, 211 (M.D. Ala. 1961), another involved a defendant who conceded the issue, *Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1462, 1466 (M.D. Fla. 1998), and the third was later abrogated, *compare Vietnamese Fisherman's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982) (citing *United States v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969)), *with White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) ("There is no way to read [*Hayes*] as eliminating generally the irreparable harm requirement ….").

Because plaintiffs will most likely be no worse off without an injunction, and their claim of ongoing race discrimination is not an irreparable injury as a matter of law, plaintiffs have plainly failed to make the required "clear showing" of irreparable harm.[4] *Payton*, 2022 WL 80317, at *5.

---

[4] Even setting aside that the most likely result here is that Comcast suspends or discontinues the RISE program, plaintiffs make no effort to establish an imminent need for the benefits of the program. They have made no allegations supporting that the pandemic or other current events uniquely harmed their businesses—to the contrary, one plaintiff boasts that he "operates multiple successful restaurants." Dkt. 1 ¶7, at 3. They do not allege that they are seeking any of Comcast's other charitable offerings or business assistance open to all small businesses. Nor do they explain why they need this Court to "immediately" enter extraordinary injunctive relief. Dkt. 1 at 11. Plaintiffs' generalized allegation that the program sounds like a "great opportunity" is not enough to establish an irreparable injury, particularly given the availability of money damages should they

Certainly alleging merely that the program sounds like a "great opportunity," Dkt. 1, ¶2, at 2, is insufficient when the statute provides, and plaintiffs seek, a damages remedy.  That failure to show irreparable harm "alone precludes the issuing of [a] preliminary injunction." *Adams*, 135 F.3d at 1154; *see, e.g.*, *Orr*, 953 F.3d at 502-03 (presuming likelihood of success on the merits and affirming denial of injunctive relief solely based on the absence of irreparable harm).

## III.    The Balance of Equities and Public Interest Strongly Favor Comcast.

The balance of equities and public interest here are not even close.  There can be no real question that the Comcast RISE program is an engine for good, providing much-needed services to communities hit especially hard by the pandemic and other current events.  Plaintiffs do not dispute the value of the program, and they could not, as the entire basis for their lawsuit is their desire to participate in it.

While plaintiffs make no claim of imminent harm aside from their generalized claim of race discrimination, *see supra* pp. 25-27 & n.4, the harm that Comcast and the public would suffer from an injunction would truly be irreparable.  As discussed, Comcast is highly unlikely to continue the RISE program in the face of an injunction, as the requested injunction here would require Comcast to disregard its goal of providing charity to underserved communities and convert the RISE program into an entirely different program.  Thus, the direct effect of an injunction would not be to give plaintiffs access to a "great opportunity," but to deny that great opportunity to everyone, including businesses hardest hit by the continuing reverberations of the pandemic.  And the forced suspension of the program would inflict irreparable harms on Comcast, which would suffer a substantial loss of goodwill from the companies that have applied in the current round,

---

ultimately prevail on their claim.  *Orr*, 953 F.3d at 502 (recognizing that irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate").

from the communities that Comcast committed to assist, and from the public officials who have committed to support the program. *See Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120-21 (7th Cir. 1997) (recognizing that damage to company's goodwill constitutes irreparable harm).

Moreover, substantial and irreparable costs would befall Comcast even if it were to rework the program to include all small businesses.  As a practical matter, compliance with plaintiffs' proposed injunction would more than triple the size of the applicant pool for RISE, requiring Comcast to find additional funding, administrative support, and personnel. *See Census Bureau Releases New Data on Minority-Owned, Veteran-Owned and Women-Owned Businesses*, U.S. Census Bureau (Oct. 28, 2021), https://bit.ly/3KSITvn; Ex. 1 ¶15.  On top of that, because expanding the program would require changing the program's core mission, reworking the program would require Comcast to divert resources to change the program rules; to find additional sources of funding to support the program's expansion; to completely reformulate its marketing and advertising, which is incompatible with a general small-business grant program; to restructure its screening and evaluation process; and to renegotiate if not terminate its agreement with its current third-party vendor, IFundWomen, which focuses on aiding underserved small businesses. *See* Ex. 1 ¶16.  These costs are substantial and irreparable.

At the same time, the public has a strong interest against injunctive relief.  The "judgment of Congress, deliberately expressed in legislation," *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001), has long recognized the "national interest" in "expeditiously ameliorat[ing] the conditions of socially … disadvantaged groups," including racial minorities, 15 U.S.C. §631(f)(1)(C)-(D); *see also, e.g.*, *Ramirez v. Collier*, 142 S. Ct. 1264, 1282 (2022) (looking to congressional judgment for public interest).  This public interest has translated into a wide array

of race-conscious programs to assist minority-owned small businesses, including preferences in contracting with underserved small businesses, 15 U.S.C. §637(a)(1)(B)-(C), (a)(5), financial assistance to minority business centers and training programs for minority-owned small businesses, 12 U.S.C. §5708(e)(1)-(2); 15 U.S.C. §9007(b)(1), and requirements that federal contractors make efforts to subcontract with minority-owned firms, 15 U.S.C. §637(d)(1)-(4); *see also, e.g.*, 12 U.S.C. §5452 (requiring agencies to establish an "Office of Minority and Women Inclusion" that, *inter alia*, develops standards for increased participation for minority-owned businesses in federal programs). The Comcast RISE program affirmatively furthers the stated public policy of the United States. At a very minimum, the public interest favors preserving the status quo, which here would allow Comcast to continue operating the RISE program as it has for over a year. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018); *see also Ind. C.L. Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001) ("A preliminary injunction is … intended to preserve the status quo until the merits of a case may be resolved.").

## CONCLUSION

For the reasons set forth above, the Court should deny the motion for a preliminary injunction.

Respectfully submitted,

s/Paul D. Clement
Paul D. Clement (pro hac vice)
Kasdin M. Mitchell (pro hac vice)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
paul.clement@kirkland.com

*Counsel for Defendant*

May 10, 2022

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on May 10, 2022, I caused the foregoing to be electronically filed with

the Clerk of the Court using CM/ECF.  I further certify that counsel for all participants in this case

are registered CM/ECF Users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement